

1995 Decisions

3-27-1995

# Christy v PA Turnpike Comm

Precedential or Non-Precedential:

Docket 94-1386

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Christy v PA Turnpike Comm" (1995). *1995 Decisions.* Paper 83.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/83

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 94-1386 and 94-1398

_____

CHARLES A. CHRISTY,

vs.

PENNSYLVANIA TURNPIKE COMMISSION, A DULY
ORGANIZED AND EXISTING AGENCY OF THE
COMMONWEALTH OF PENNSYLVANIA; ROBERT BRADY,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
JAMES J. DODARO, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; HOWARD YERUSALIM,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
FRANK S. URSOMARSO, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; JAMES F. MALONE, III,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
JOHN L. SOKOL, JR., INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; S. MICHAEL PALERMO,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
JOSEPH L. DIRIENZO, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; SAMUEL S. CARNABUCI,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
MELVIN M. SHELTON, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; DEBORAH KOVAL,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY;
JOHN A. BOSCHI, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; VINCENT J. GRECO,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
JOHN A. STEWART, INDIVIDUALLY AND IN HIS
OFFICIAL CAPACITY; GEORGE PILECKI,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;
SEAN PILECKI, INDIVIDUALLY

  Pennsylvania Turnpike Commission, Robert
  Brady, Vincent Greco and John Stewart

      Appellants No. 94-1386

  John A. Boschi,

      Appellant No. 94-1398

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. Civil No. 93-cv-03346)


ARGUED SEPTEMBER 12, 1994

BEFORE:  STAPLETON, ALITO and LEWIS, <u>Circuit</u> <u>Judges</u>.

(Filed   March 27, l995)


Michael M. Baylson (ARGUED)
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA  19103-7396

        <u>Attorney for Appellants, Pennsylvania</u>
        <u>Turnpike Commission, Robert Brady, Vincent</u>
        <u>Greco and John Stewart</u>


David S. Fortney (ARGUED)
Lisa G. DiPietro
Reed, Smith, Shaw & McClay
1650 Market Street
2500 One Liberty Place
Philadelphia, PA  19103-7301

        <u>Attorney for Appellant, John A. Boschi</u>


Joseph F. Lawless, Jr. (ARGUED)
6 Harvey Lane
Newtown Square, PA  19073

John P. Hickey
Imogene E. Hughes
Kleinbard, Bell & Brecker
1900 Market Street
Suite 700

Philadelphia, PA  19103

Attorneys for Appellee

---

OPINION OF THE COURT

---

LEWIS, Circuit Judge.

In this case, we must determine whether the
Pennsylvania Turnpike Commission ("Commission") is an "arm" or
"alter ego" of the Commonwealth of Pennsylvania and thus entitled
to Eleventh Amendment immunity from suit in federal court.
Because we conclude that the Commission is not an arm or alter
ego of Pennsylvania we will affirm the district court's finding
that the Commission does not enjoy Eleventh Amendment sovereign
immunity.

I.

The appellee, Charles Christy ("Christy"), has been an
employee of the Commission since 1976.[1]  In November of 1992,
Christy made application for the position of Paint Crew Foreman.
He was interviewed for this position in early 1993 by the
appellants John Boschi, Vincent Greco and John Stewart.[2]  Christy
was then chosen as one of three final candidates for the Paint
Crew Foreman position.  The names of the three final candidates
were passed to the Commission's personnel committee for final

---

[1].     Since 1983, Christy has been employed as an Auto
Mechanic 1.

[2].     John Boschi is currently the Commission's Deputy Executive
Director of Maintenance; Vincent Greco is Eastern Division
Superintendent of the Commission; and John Stewart is Assistant
Deputy Executive Director of Maintenance for the Commission.  The
other individual defendant in this appeal, Robert Brady, is a
Turnpike Commissioner.

review.  The personnel committee then recommended that the position be awarded to one Sean Pilecki, a Commission employee during the preceding four and a half years.  The Commission adopted the personnel committee's recommendation and hired Mr. Pilecki.  Christy subsequently applied and was turned down for the position of Eastern Division Equipment Supervisor.

Christy then sued the Commission and its individual commissioners and personnel committee members pursuant to 42 U.S.C. §§ 1983 and 1985, claiming that he was not promoted due to political bias against him.  In response to Christy's claims of political bias, the Commission and individual defendants Brady, Greco and Stewart filed a joint motion for summary judgment, while the defendant Boschi filed a separate summary judgment motion.  The district court denied the defendants' motions, ruling as a matter of law that the Commission was not entitled to Eleventh Amendment immunity, and rejecting the individual defendants' claims of qualified immunity.  These appeals followed.

## II.

The district court had jurisdiction in this case pursuant to 28 U.S.C. §§ 1343(a)(3) and 1367(a).[3]  We have

---

[3] .    The Commission argues that the district court lacked subject matter jurisdiction over it because Christy had elected to drop the Commission as a party by the time the district court ruled on the Eleventh Amendment issue.  Putting aside the question whether or not Christy in fact effectively dropped the Commission as a party, the Commission is incorrect in asserting that the district court lacked subject matter jurisdiction over it at the time the court ruled on the Eleventh Amendment issue. Christy sued the individual defendants in both their individual and official capacities.  A suit against an individual in his or

appellate jurisdiction pursuant to 28 U.S.C. § 1291 over the district court's denial of the defendants' motions seeking summary judgment on Eleventh Amendment grounds.  See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., ___ U.S. ___, 113 S. Ct. 684, 687–89, 121 L.Ed.2d 605 (1993) (holding that district court orders denying Eleventh Amendment immunity claims by states or putative "arms of the state" are immediately appealable under the collateral order doctrine).[4]  We exercise plenary review of

(..continued)
her official capacity is no different from a suit against that individual's office.  "As such, it is no different from a suit against" the office itself.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (citations omitted); see also Kentucky v. Graham, 473 U.S. 159 (1985) (emphasizing that official capacity suits "`generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (citation omitted)).  In this case, a suit against the individual defendants in their official capacities is the same as a suit against the Commission.  The individual defendants have asserted Eleventh Amendment immunity in relation to Christy's official capacity claims, and pressed that immunity in their summary judgment motions before the district court.  Thus, the issue of the Commission's entitlement to sovereign immunity was properly before the district court at the time the court ruled on the issue.

[4].    We will dismiss for lack of appellate jurisdiction the individual defendants' appeals from the district court's denial of their motions for summary judgment on qualified immunity grounds.  While we have appellate jurisdiction to consider the denial of summary judgment when such denial is based on the district's conclusion that the movant is not entitled to qualified immunity, see, e.g., Brown v. Grabowski, 922 F.2d 1097, 1105 (3d Cir. 1990), the district court in this case did not rule that the individual defendants were not entitled to qualified immunity.  Rather, it ruled that it could not find qualified immunity based on the facts at summary judgment.  The district court could still find at the close of evidence at trial that the individual defendants are entitled to qualified immunity in relation to Christy's claims brought against them in their individual capacities.

the district court's denial of the defendants' motions for summary judgment.  Rappa v. New Castle County, 18 F.3d 1043, 1050 (3d Cir. 1994).

III.

We must determine whether the district court correctly concluded that the Commission is not an "arm" of Pennsylvania and therefore not entitled to sovereign immunity under the Eleventh Amendment.[5]  The question whether the Commission is an "arm" of the State is one of federal law.  Blake v. Kline, 612 F.2d 718, 722 (3d Cir. 1979).  However, before undertaking our Eleventh Amendment analysis, we must decide a question of apparent first impression in this Circuit:  who bears the burden of production and persuasion with respect to factual questions when a putative state entity claims immunity under the Eleventh Amendment?  We conclude that the party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability.  In so concluding, we adopt the reasoning set forth by the Court of Appeals for the Ninth Circuit in ITSI TV Productions v. Agricultural Associations, 3 F.3d 1289 (9th Cir. 1993).  Because Eleventh Amendment immunity can be

---

[5].    The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ."  U.S. Const. amend. XI.  Its explicit terms notwithstanding, the Eleventh Amendment has consistently been interpreted to immunize an unconsenting state  "`from suits brought in federal courts by her own citizens as well as by citizens of another state.'"  Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100 (1984) (citation omitted).

expressly waived by a party, or forfeited through non-assertion, it does not implicate federal subject matter jurisdiction in the ordinary sense.  Id. at 1291.  We agree with the Ninth Circuit that "whatever its jurisdictional attributes, [Eleventh Amendment immunity] should be treated as an affirmative defense[,]" and "[l]ike any other such defense, that which is promised by the Eleventh Amendment must be proved by the party that asserts it and would benefit from its acceptance."  Id.  We also agree with the Ninth Circuit that considerations of fairness support this conclusion.  As the court noted in ITSI TV Productions:

> In general, a claim of Eleventh Amendment immunity will occasion serious dispute only where a relatively complex institutional arrangement makes it unclear whether a given entity ought to be treated as an arm of the state.  In such cases, the "true facts" as to the particulars of this arrangement will presumably "lie particularly within the knowledge of" the party claiming immunity.

Id. at 1292 (citations omitted).

Having concluded that the party asserting Eleventh Amendment immunity bears the burden of proving entitlement to it, we turn now to the merits of the immunity question.  We have on numerous occasions set forth the criteria to be considered in determining whether an entity is an "alter ego" or "arm" of a state for purposes of the Eleventh Amendment.  See e.g., Peters v. Delaware River Port Authority, 16 F.3d 1346, 1350 (3d Cir. 1994); Bolden v. Southeastern Pennsylvania Transp. Auth., 953 F.2d 807, 816-818 (3d Cir. 1991) (in banc); Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989)

(in banc).  Our oft-reiterated test entails three distinct inquiries:  (1) whether, in the event the plaintiff prevails, the payment of the judgment would come from the state (this includes three considerations:  whether the payment will come from the state's treasury, whether the agency has sufficient funds to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts); (2) the status of the agency under state law (this includes four considerations:  how state law treats the agency generally, whether the agency is separately incorporated, whether the agency can sue and be sued in its own right, and whether it is immune from state taxation); and (3) what degree of autonomy the agency enjoys.  Peters v. Del. River Port Authority, 16 F.3d 1346, 1350 (3d Cir. 1994) (citing Bolden v. Southeastern Pa. Transp. Auth., 953 F.2d 807, 816 (3d Cir. 1991) (in banc)).  We turn now to this three-pronged inquiry.

### A.  Funding

We have explained that although no single factor is dispositive of the Eleventh Amendment inquiry, the "most important" factor is whether a judgment against the entity in question, in this case the Commission, would be paid out of the state treasury.  See, e.g., Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (in banc).  The special emphasis we place upon the funding factor is supported by the Eleventh Amendment's central goal:  the prevention of federal court judgments that must be paid out of the State's treasury.  See Fitchik, 873 F.2d at 659-60 (citing

Edelman v. Jordan, 415 U.S. 651 (1974)).  The Supreme Court has recently reiterated the significance accorded this factor in relation to other Eleventh Amendment considerations.  In Hess v. Port Authority Trans-Hudson Corporation, 115 S. Ct. 394 (1994), the Court explained that "prevention of federal court judgments that must be paid out of a State's treasury" formed the "impetus" for the Eleventh Amendment.  Hess, 115 S. Ct. at 404.

> Accordingly, Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations . . . .  "[T]he vast majority of Circuits have concluded that the state treasury factor is the most important factor to be considered and, in practice, have generally accorded this factor dispositive weight."

Id. (citations omitted).

    1.  Whether Payment Will Come from the State's Treasury

Pursuant to the Turnpike Organization, Extension and Toll Road Conversion Act ("The Act"), 36 P.S. §§ 651.1 et. seq., the Commission is authorized to obtain funds through the collection of tolls for the use of the Pennsylvania Turnpike System.  36 P.S. § 651.16.  The Commission is also authorized to collect rents and charges for telephone and electric lines, gas stations, garages, stores, hotels, restaurants and advertising signs.  Id.  The Act also authorizes the Commission to obtain funds through the issuance of bonds, notes and other obligations.  Id. at § 651.12.  In addition, the Act authorizes the Commission to obtain funds from the federal government.  Id. at § 651.19.  Finally, the Commission receives some funding out of

Pennsylvania's oil company franchise tax collections. 75 Pa.C.S.A. § 9511(h).

The Commission notes that only one of these funding sources -- tolls -- is not subject to state control. According to the Commission, the state's regulation and control of the Commission's funding is crucial to our analysis of the funding factor. Also significant, according to the Commission, is the fact that upon retiring its debts, or setting aside funds sufficient to do so, the Commission is to be dissolved and all of the Commission's property is to be vested in the Department of Highways. See 36 P.S. § 652o.

We do not know what percentage of the Commission's funding might be attributed to each of the funding sources identified above. We are, of course, able to observe that only one of the five available sources of funding -- the oil company franchise tax -- is obtained from the state. The other four sources -- tolls, rents, bond and note revenues, and federal funding -- are not state-derived. That four of the five established sources of the Commission's funding are not state-derived is, we think, even in the absence of additional information, some support for the conclusion that the Commission is not the alter ego of Pennsylvania.[6]

---

[6]. Although the figure does not appear in the record, the Commission has represented to us that it has received "more than $112,000,000" in oil company franchise tax revenues. (Commission brief at 36 n.18). We fail to see, however, how we can draw any conclusion from this representation, given that the Commission has failed to provide information regarding the percentage of its annual revenues received in this form. See Bolden, 953 F.2d at 819-20 (without knowing what percentage of SEPTA's total revenue

The degree of state regulation of the Commission's funding does not alter our conclusion that the funding factor weighs against according immunity to the Commission. We have explained that state control is only significant to the funding analysis where such control indicates state ownership of the funds. Fitchik, 873 F.2d at 661. In other words, state control over an entity's ability to obtain funds is inadequate to demonstrate state ownership of the funds where the state is not shown to have a financial interest that would be directly and adversely affected by the diminution of the funds in question. See id. Otherwise, the degree of state control over the entity's funding is relevant to the autonomy inquiry, which we discuss below. Id. Here, the state's control over the Commission's authority to issue bonds, notes and other obligations falls short of indicating state ownership of the funds obtained through the issuance of such bonds, notes and other obligations. Likewise, state control over the Commission's ability to obtain federal funding falls short of indicating state ownership of the federal funds obtained. The Commission's evidence of state control over its ability to obtain funds simply fails to show a financial interest on the part of Pennsylvania that would be directly and adversely affected by the diminution of the Commission's funds obtained through the issuance of bonds or from the federal government.

(..continued)
comes from state funds under a particular new law, we held that the impact of the law on SEPTA's funding was too uncertain to be given significant weight in the funding analysis).

Nor is our conclusion with respect to the funding factor altered by the fact that the Commission will one day be dissolved and all its remaining funds and property vest in the Department of Highways. Pursuant to 36 P.S. § 652o:

> When all bonds and the interest thereon shall have been paid or a sufficient amount for the payment of all bonds and the interest to maturity thereon, shall have been set aside in trust for the benefit of the bondholders, and shall continue to be held for that purpose, the turnpike and the connecting tunnels and bridges shall become a part of the system of State highways, and shall be maintained by the Department of Highways free of tolls, and thereupon the commission shall be dissolved, and all funds of the commission not required for the payment of the bonds and all machinery, equipment and other property belonging to the commission, shall be vested in the Department of Highways.

36. P.S. § 652o. Thus, the dissolution of the Commission is statutorily contingent upon the Commission satisfying, or being able to satisfy, all of its debts and obligations. If anything, this provision provides further support for our conclusion by illustrating the state's reluctance to take on the Commission's financial obligations as its own.

2. Whether the Commission Could Satisfy a Judgment Against It

We do not know how much money the Commission has or would have available to it to satisfy a potential judgment against it. According to the Commission, the lack of record evidence on this point renders this second funding inquiry "irrelevant." We do not agree. Since the Commission bears the burden of proving its entitlement to Eleventh Amendment immunity,

the Commission's failure to provide pertinent information regarding its ability, or lack thereof, to satisfy a potential judgment against it simply means that the Commission has failed to sustain its burden of proof on this important question. Moreover, even in the absence of such evidence, our cases enable us to draw certain conclusions, with respect to the Commission's ability to pay a judgment against it. In both Bolden and Fitchik, we suggested that an entity with power to raise revenues by raising fares need not request funds from the state to meet shortfalls caused by adverse judgments. See Bolden, 953 F.2d at 819; Fitchik, 873 F.2d at 661.[7] The Commission is authorized "to fix, and to revise, from time to time," tolls for the use of the Pennsylvania Turnpike System. 36 P.S. § 651.16(a). In fact, the Commission's authority to set the toll rate "shall not be subject to supervision or regulation by any other State commission, board, bureau or agency." Id. at § 651.16(b). In light of Bolden and Fitchik, we think the Commission's power to raise revenue levels by increasing the toll rates, even in the absence of information regarding the Commission's financial condition and consequent ability to pay a judgment against it, supports the view that the Commission need not seek assistance from the state to satisfy a judgment against it.

3. Whether the Sovereign has Immunized Itself

---

[7]. We also noted in Fitchik, alternatively, that the entity could cover a shortfall by reducing its expenses or capital budget. Fitchik, 873 F.2d at 661. Similarly, the Commission would, we imagine, be able to cover a shortfall by reducing its expenses or capital budget.

The Act provides that "[a]ll compensation and salaries and all expenses incurred in carrying out the provisions of this act shall be paid solely from funds provided under the authority of this act . . . ." 36 P.S. § 651.8(a). Furthermore, the Act provides that all bonds, notes and other obligations issued by the Commission under the Act

> shall not be deemed to be a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth, but such bonds, notes or other obligations shall be payable solely from the revenues of the commission . . . . All such bonds, notes or other obligations shall contain a statement on their face that the Commonwealth is not obligated to pay the same or the interest thereon except from revenues of the commission . . . and that the faith and credit of the Commonwealth is not pledged to the payment of the principal or interest of such bonds, notes or other obligations. The issuance of turnpike revenue bonds, notes or other obligations under the provisions of this act shall not directly or indirectly or contingently obligate the Commonwealth to levy or to pledge any form of taxation whatever therefor or to make any appropriation for their payment.

36 P.S. § 651.4.

The Commission observes that the General Assembly of Pennsylvania has not expressly immunized the state from responsibility for all of the Commission's possible debts and liabilities. Nowhere in the Commission's original or subsequent enabling acts, the Commission notes, is there a provision disclaiming Pennsylvania's responsibility for the Commission's unassumed liabilities and obligations. One can imagine, the Commission suggests, numerous situations in which the Commission

would face unassumed liabilities or debts large enough to exhaust the Commission's funds and necessitate the Commission's rescue by the Commonwealth.

In light of our case law, we do not agree that the absence of a blanket disclaimer is significant. What is significant under our case law is the fact that the Commission has failed to establish that Pennsylvania is under any affirmative obligation to pay the Commission's unassumed liabilities in the first place. See Bolden, 953 F.2d at 819 ("A state legislature might feel compelled as a practical matter to subsidize a variety of entities that provide necessary services, including financially pressed municipalities. Such discretionary subsidies committed in reaction to a judgment, however, would not necessarily transform the recipients into alter egos of the state."). Although the Commonwealth might well choose to appropriate money to the Commission to enable it to meet a shortfall caused by an adverse judgment, such voluntary payments by a state simply "`do not trigger [Eleventh Amendment] immunity.'" Id. (quoting Fitchik, 873 F.2d at 661).[8]

---

[8]. Christy contends that the Commission is able to self-insure and to purchase liability insurance, and that the Commission in fact self-insures at least part of its contingent liabilities under the Commonwealth's Employee Liability Self-Insurance Program. We have in cases past considered an entity's ability to obtain insurance as evidence of that entity's financial self-sufficiency and independence from the state. See Bolden, 953 F.2d at 819; Fitchik, 873 F.2d at 661. The Commission counters that the alleged fact of the Commission's self-insurance is not in evidence noting that "[n]o record reference is offered [by Christy], nor does any affidavit, deposition excerpt, or document included in the record support this statement." (Commission reply at 19 n.14). But the Commission overlooks the fact that it

The Commission has failed to establish that (1) a judgment against it would be tantamount to a judgment against the Treasury of the Commonwealth of Pennsylvania; (2) the Commission lacks financial resources sufficient to pay a potential judgment against it; or (3) Pennsylvania would be under any obligation to cover any such potential judgment against the Commission. Accordingly, on the record as it stands before us, the funding factor, the most important of the three, weighs heavily in support of the conclusion that the Commission is not an arm of the Commonwealth of Pennsylvania and does not enjoy Eleventh Amendment immunity from suit in federal court.

## B. Status at State Law

The second general factor we must consider in determining whether the Commission is an arm or alter ego of the Commonwealth of Pennsylvania is the status of the Commission under Pennsylvania law. Our purpose here is to determine whether Pennsylvania law treats the Commission as an independent entity, or as a surrogate for the state. See Fitchik, 873 F.2d at 662.

In Specter v. Commonwealth, 341 A.2d 481 (1975), a plurality of the Pennsylvania Supreme Court held that the Commission is not an arm of the Commonwealth and not entitled to sovereign immunity. After examining the legislative acts creating the Commission and defining its purposes and powers, as

(..continued)
bears the burden of proving entitlement to Eleventh Amendment immunity; its failure to provide evidence of an inability to obtain insurance is our primary concern, not Christy's failure to cite record evidence to the contrary.

well as judicial decisions in which the Commission's status was at issue, the court explained that:

> There is, of course, no doubt that the Commonwealth itself could have constructed the Turnpike in the same manner that it constructs and operates its State highways. Had it done so, the State's immunity from suit would encompass actions arising in connection with the Turnpike. But the Commonwealth itself did not build this highway and does not maintain it. The legislature created this separate body and at the same time disclaimed any responsibility on the part of the Commonwealth for liabilities which it, the Commission, might incur. It is clear that the Commission is not an integral part of the Commonwealth, and cannot share the attributes of sovereignty which inhere in the state. It follows that the Commission is not immune from suit in tort for the acts of its servants and agents acting in the course of their employment or agency.

Id. at 491 (emphasis in original).

The Commission does, we recognize, possess certain attributes associated with sovereignty. For example, the Commission (1) may exercise the power of eminent domain; see 36 P.S. §§ 651.9 – .11; (2) enjoys statutory immunity from suit in state court; see 42 Pa.C.S.A. § 8522(a); and (3) is exempt from all state property taxation; see 36 P.S. § 651.15. On the other hand, the Commission possesses certain traits not at all characteristic of an arm of the state; for example, the Commission may sue and be sued in its own name; see 36 P.S. § 651.7(a)(3); and has the power to enter into contracts in its own name; see 36 P.S. § 651.7(a)(2).

On balance, the "status under state law" factors weigh slightly in favor of the conclusion that the Commission is not an arm of the Commonwealth of Pennsylvania. This is true, especially in light of the plurality holding of the Pennsylvania Supreme Court in Specter that the Commission is not an integral part of the Commonwealth, and thus cannot share the attributes of sovereignty which inhere in the state. Cf. Peters, 16 F.3d at 1351 (holding that the Delaware River Port Authority's status under state law weighs in favor of the conclusion that the agency does not enjoy sovereign immunity, especially in light of a Pennsylvania Supreme Court case holding that the DRPA is not "`an integral part of the Commonwealth of Pennsylvania'" (citation omitted)).

The Commission contends that in enacting Pennsylvania's sovereign immunity statute, see 42 Pa.C.S.A. §§ 8501 et seq., the Pennsylvania legislature "conclusively repudiated" Specter's conclusion that the Commission is separate and apart from the Commonwealth. The Commission further notes that in two unanimous, post-Specter, decisions, the Pennsylvania Commonwealth Court confirmed that the Commission enjoys sovereign immunity. See Pennsylvania Turnpike Commission v. Jellig, 563 A.2d 202 (Pa.Cmwlth. 1989); Bradley v. Pennsylvania Turnpike Commission, 550 A.2d 261 (Pa.Cmwlth. 1988). To accord Specter any deference, the Commission argues, is to give Specter value already taken away by the Pennsylvania legislature and judiciary.

We do not share the Commission's appraisal of Specter's continued vitality. Passage of the Pennsylvania sovereign

immunity statute has not diminished the significance of Specter's analysis to our assessment of the Commission's claim of entitlement to Eleventh Amendment immunity. By enacting an immunity statute pursuant to which the Commission is accorded sovereign immunity, the Pennsylvania legislature did not "conclusively repudiate" Specter's conclusion that the Commission is not an integral part of the Commonwealth and does not share the attributes of sovereignty inhering in the state. In enacting the sovereign immunity statute, the Pennsylvania legislature merely conferred upon entities such as the Commission by way of statute that which they otherwise lacked, namely, immunity from suit in state court. We implied as much in Toombs v. Manning, 835 F.2d 453 (3d Cir. 1987), in which we explained that

> [t]he significance to our analysis of the legislature's inclusion of the . . . Commission as an immune agency is that it is clear that the General Assembly intended to provide sovereign immunity protection not only for those entities which before Mayle[ v. Pennsylvania Department of Highways, 388 A.2d 709 (1978) (in which the Pennsylvania Supreme Court abrogated sovereign immunity)] had been immune as sovereigns, but also for those entities not previously immune, but which now came within the statute's scope.

Toombs, 835 F.2d at 459 (footnote omitted) (emphasis supplied). Nor do Jellig and Bradley undermine the continuing validity of Specter's analysis. In those cases, the Pennsylvania Commonwealth Court merely applied the Pennsylvania sovereign immunity statute to find, unremarkably, that the Commission

enjoys sovereign immunity from suit in state court. See Jellig, 563 A.2d at 205; Bradley, 550 A.2d at 263.[9]

## C. Autonomy

The Commission's membership is controlled by the executive and legislative branches of the Commonwealth. One member of the five-person Commission must always be the Secretary of Transportation, a cabinet-level position appointed by the Governor and confirmed by the Pennsylvania Senate. See 36 P.S. §§ 651.5(d), 652d; see also 71 P.S. § 67.1(d)(1) (Gubernatorial appointment and senatorial confirmation of Secretary of Transportation). The four remaining Commission members are also appointed by the Governor and confirmed by the Senate. See 36 P.S. §§ 651.5(b), 652d; see also 71 P.S. § 67.1(c)(2)

---

[9]. We recognize that the Pennsylvania sovereign immunity statute itself is some evidence of the Commission's status before the law of Pennsylvania. And as some evidence of the Commission's status at state law, it is relevant to our Eleventh Amendment inquiry. However, it is far from determinative of that inquiry. We have explained that state law extending sovereign immunity to an agency is "relevant to the Eleventh Amendment determination, but it is not dispositive." Bolden, 953 F.2d at 815 n.8 (citations omitted).

> Thus, a state law determination of sovereign immunity may coincide with and influence the federal law determination of Eleventh Amendment status, but the former does not conclusively determine the latter . . . . [Otherwise], each state legislature apparently could confer Eleventh Amendment protection on any entity it wished, including counties and cities, by enacting a statute clothing these entities with "sovereign immunity" from suit on state claims.

Id. at 815 n.8, 817.

(Gubernatorial appointment and senatorial confirmation of Commission members).  State authority over the appointment of Commission members lends obvious support to a finding of sovereignty.  See Peters, 16 F.3d at 1351–52.

On the other hand, weighing in favor of a finding of autonomy are the facts that the Commission may fix and revise tolls; enter contracts in its own name; issue bonds and notes; sue in its own name; purchase and own property; and promulgate rules and regulations for its own governance.  See 36 P.S. § 651.16 (fix and revise tolls); 36 P.S. § 651.7 (enter contracts, sue in its own name, purchase and own property, and promulgate rules and regulations for its own governance); 36 P.S. § 651.12 (issue bonds and notes).  Of course, several of these powers are subject to a degree of state control.  For example, the Pennsylvania Attorney General must review the form and legality of each contract and rule or regulation the Commission proposes.  See 71 P.S. § 732–204(b) (review of rules and regulations); 71 P.S. § 732–204(f) (review of contracts).  Moreover, Commission issuance of bonds and notes is subject to state approval.  See 36 P.S. § 652u.1

On balance, the significant control the Commonwealth exercises through the power to appoint all the members of the Commission weighs slightly in favor of Commission immunity from suit.  Cf. Peters, 16 F.3d at 1351–52 (where separately incorporated agency was found to have power to enter contracts, hold property, and set and collect tolls, we held that the autonomy factor weighed "slightly" in favor of affording immunity

in light of the states' power to appoint the members of the board of the agency in question).

### D.   The Totality of Factors

Having considered each of the three factors above, we now must consider the three factors in their totality.  See Bolden, 953 F.2d at 821.  Since the most important factor, funding, weighs heavily against the Commission and only one factor weighs, even slightly, in favor of the Commission, the balance is clearly struck against a finding that the Commission enjoys sovereign immunity as an arm of the Commonwealth of Pennsylvania.  Consequently, we find that the Commission is subject to suit in federal court.  We will affirm the district court's conclusion to this effect.

### IV.   Conclusion

For the reasons stated above, we will affirm the district court's denial of the defendants' motions for summary judgment on Eleventh Amendment immunity grounds, and will dismiss for lack of appellate jurisdiction the defendants' appeals from

the district court's denial of their motions for summary judgment on qualified immunity grounds.

_____